**Frank MOLEY and Marie Moley, Appellants,**

v.

**Thomas G. BLAKEMAN and Louise Blakeman, Respondents.**

No. 22305.

Kansas City Court of Appeals.

Missouri.

Jan. 9, 1956.

James Daleo, Kansas City, for appellants.

Arthur Brewster, Keith Martin, Kansas City, for respondents.

BROADDUS, Judge.

This is an action seeking an injunction to prevent the defendants from removing certain sewer pipes which plaintiffs had placed on defendants' lot. Trial before the circuit court resulted in a judgment in favor of defendants and plaintiffs appeal.

Plaintiffs, Mr. and Mrs. Frank Moley own the northeast corner of 37th Street and Prospect in Kansas City, Missouri. Their property consists of four lots fronting on Prospect Avenue just north of 37th Street. Prospect Avenue runs north and south and 37th Street east and west.

Defendants, Mr. and Mrs. Thomas Blakeman own a house and lot at 3636 Montgall Avenue. Montgall is the first street east of Prospect. Running from the north and about 35 feet from the west line of the lots which front on Montgall is a 15 inch sewer pipe. Near the south line of defendants' lot this sewer turns east and finally connects with a larger sewer on Montgall.

The testimony on behalf of plaintiffs was that they purchased the Prospect Avenue property in June, 1945. At that time a building was located on their lots, but the building had no guttering and water ran off the roof and onto defendants' lots. Plaintiff Frank Moley testified that in August or September 1945, defendant Thomas Blakeman, came to plaintiffs' back yard and asked him (Moley) if anything could be done about the surface water running off into defendants' yard from plaintiffs' yard. Nothing was done by either plaintiffs or defendants at that time. Mr. Moley further testified that in April or May 1946, Mr. Blakeman again approached him and entreated him to do something about the water flooding Blakeman's basement, and offered to let plaintiffs hook up to defendants' sewer in the back of defendants' property, so as to prevent water from draining off of plaintiffs' lots onto defendants'.

Mike Moley, father of Frank Moley, testified that he was present at the time the conversation took place between his son and Blakeman in April or May 1946, and that his son told Blakeman that he was not concerned about the water; that it didn't bother him, and that Blakeman then asked Frank Moley if he would be willing to connect with Blakeman's sewer.

Plaintiff Frank Moley further testified that he subsequently dug a ditch about 8 or 9 feet deep and laid a six inch pipe from his property to the sewer manhole on defendants' lot at a cost of about $650. He also testified that he installed a guttering on the building and pipes leading to the sewer.

The testimony disclosed that subsequent to 1946 plaintiffs built additional buildings on their lots and installed more guttering; that they ran a restaurant and in 1951 they began to operate a car washing business. Plaintiff Frank Moley stated on cross-examination: "We have got all the drain water coming off the roofs. We have got the car wash and four toilets." He testified that he connected the car wash and a part of the restaurant to the sewer, at a cost of $700 or $800; that Mr. Blakeman gave him the right to permanently connect the sewer, to take care of

the surface water running onto Blakeman's property, and that, further, Blakeman "did not limit it to taking care of the surface water."

Defendants admit that they had demanded that plaintiffs remove the sewer constructed by plaintiffs and that defendant Thomas Blakeman had threatened to disconnect it.

Defendant, Thomas Blakeman, testified that he had lived at 3636 Montgall since 1925; that his property had "always been below the property on Prospect"; that he had complained about brush and dirt washing off the hill; that the first time surface water was mentioned was when plaintiff Frank Moley came to defendants' house and said he (Moley) had put guttering on the buildings and did not have any place to run the water; that he (Moley) thought the downspout connected with the sewer on Prospect, but that he was wrong; that he told Moley to connect with the sewer on Prospect but that Moley replied that "it would cost him too much money."

Mr. Blakeman further testified: "I told him—his request was that he wanted to take care of the water off of his roof. I says, 'Is that all you are going to put on there?' And he said, 'Yes, that is all I want, to take care of the water.' I said, 'I am afraid if I let you put it on there, you will put something else on there.' He says, 'No, I promise I won't put anything but the water off of the roof.'"

After Mr. Blakeman found out that plaintiffs had begun to operate the car washing business he testified he said to Moley: " 'Now, you are hooking up here and I—you promised me that you are not going to hook up anything else, and will you promise me that you won't hook up anything else up there?' And he did, that he would hook up nothing else but the water from the drain. Later on, he hooked up these other things. * * * Q. You never gave him permission to hook up these other—A. No, sir, the only permission I gave him was to connect up the water from his roof and he promises me faithfully that was the only thing ever to

be connected and that was only a temporary affair until he could hook up on Prospect."

Mr. Blakeman also testified that the sewer line which plaintiffs placed on defendants' lot was only 18 inches deep. He also testified that Frank Moley asked for an easement, which he (Blakeman) refused.

Mrs. Easterday, a neighbor of defendants, testified that while the sewer connection was being made she talked to plaintiff Frank Moley and that he said he was "installing a connection to take care of the guttering, the drainage from the roofs of that half block of property he has up there behind us."

Defendant, Louise Blakeman, testified that she heard her husband and Frank Moley talking back of defendants' house in 1945 or 1946 and that the "connection to be made was for the surface water only from the roofs of those buildings back of us."

The evidence further disclosed that the lots owned by plaintiffs are located in a different sewer district than that of defendants

This case being in equity, it is heard here *de novo* on appeal and the weight of the evidence is properly passed upon by this court. However, we will usually defer to the findings of the chancellor, especially where there is conflicting verbal testimony involving credibility of witnesses who appeared before him, except when convinced that his findings are against the weight of the evidence. Shaw v. Butler, Mo.Sup., 78 S.W.2d 420, 421.

The question to be determined in this case is whether the use was really *adverse* to the owners, or was it merely permissive in its character? In the leading case on the subject in this State, that of Pitzman v. Boyce, 111 Mo. 387, loc.cit. 392, 19 S.W. 1104, loc.cit. 1105, it is said, "If permissive in its inception, then such permissive character, being stamped on the use at the outset, will continue of the same nature, and no adverse user can arise un-

til a distinct and positive assertion of a right hostile to the owner, and brought home to him, can transform a subordinate and friendly holding into one of an opposite nature, and exclusive and independent in its character."

We have set out the testimony somewhat in detail. We agree with the finding of the learned chancellor that the weight of the evidence shows that the license granted plaintiffs was temporary and for a limited use only. Thus, defendants had a right to revoke it. In the instant case, as in the Pitzman case "the use * * * was not adverse, but merely permissive." The fact situation in the Pitzman case is similar to the one in the case at bar.

Plaintiffs make one other point. However, the matter complained of was not called to the trial court's attention in the motion for new trial.

The judgment is affirmed. All concur.